**SALEM LAUNDRY COMPANY,**
**Plaintiff, Appellant,**

v.

**NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND, et al., Defendants, Appellees.**

**No. 87–1113.**

United States Court of Appeals,
First Circuit.

Argued July 31, 1987.

Decided Sept. 28, 1987.

---

Laurence J. Donoghue with whom Robert P. Morris and Morgan, Brown & Joy, Boston, Mass., were on brief, for plaintiff, appellant.

Gabriel O. Dumont, Jr., with whom James T. Grady and Grady, Dumont & Dwyer, Boston, Mass., were on brief for defendants, appellees.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

Salem Laundry Co., a Massachusetts corporation located in Salem, sold part of its business to Whyte's Laundry, Inc., a Massachusetts corporation located in Lynn, in a written agreement dated September 30, 1980. The issue before us on appeal is whether the district court erred in concluding that the parties had no prior, oral contract to effect the sale. The existence of an enforceable contract of sale on or before September 26, 1980, would relieve Salem of withdrawal liability on behalf of its former employees to the New England Teamsters and Trucking Industry Pension Fund. *See* 29 U.S.C. §§ 1381 *et seq.* (1985).

In July 1980, John Hooper, president of Salem Laundry, approached Russell Goldsmith, president of Whyte's Laundry, about the possibility of selling a portion of Salem's business to Whyte's. Goldsmith told Hooper he was interested, provided certain conditions could be worked out, and that Hooper's suggested price was fine. Hooper and Goldsmith met three more times, in August and on September 16 and 19, and discussed and agreed upon increasingly more detailed aspects of the sale. Salem's attorney prepared the first written draft of the sales agreement in August. Whyte's attorney prepared a new draft on September 23, which he altered slightly on September 26 in response to a telephone conversation between Hooper and Goldsmith. Hooper and Goldsmith signed that agreement on September 30.

The truck drivers in the laundry delivery system sold to Whyte's had been represented by Local 42 of the Teamsters. As part of the collective bargaining agreement between Local 42 and Salem, Salem had been contributing to the Pension Fund on the employees' behalf for many years. Under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C.

§§ 1381 *et seq.* (1985), which amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (1985), employers that withdraw from a multiemployer pension fund, such as the Pension Fund here, are liable for withdrawal payments to offset the unfunded pension liability of covered employees. *See generally Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 762 F.2d 1124 (1st Cir. 1984), *reh'g en banc,* 762 F.2d 1137 (1985). Accordingly, the Pension Fund assessed a withdrawal liability of $173,831 on Salem in August 1981. Salem then filed this action in December 1981, seeking declaratory and injunctive relief from the withdrawal liability.

Salem's theory below was based on § 558 of the Deficit Reduction Act of 1984, Pub.L. 98–369, which provided that no withdrawal liability would be assessed on employers that had a "binding agreement to withdraw" from a multiemployer pension plan on or before September 26, 1980. The United States District Court for the District of Massachusetts found that Salem did not have such an agreement, however, because neither Salem nor Whyte's could have enforced the sales agreement until it was signed on September 30, 1980.

*Standard of Review*

■ Salem argues that this court should review the trial court's finding as to the date of the sales agreement de novo, rather than under the "clearly erroneous" standard applicable to findings of fact. *See* Fed.R.Civ.P. 52(a). Because the only evidence offered on the date of the contract was through Salem's witnesses Hooper and Goldsmith, the company argues that the "facts" were uncontradicted, leaving only the legal question of whether those facts indicate a prior oral contract.

We disagree. "[I]t is a question of fact whether any particular conduct or actions imply a contractual understanding." *Corbin on Contracts* § 18(B), at 21 (*Kaufman* supp. 1984); *see Chedd-Angier Production Co. v. Omni Publications Int'l, Ltd.,* 756 F.2d 930, 935 (1st Cir.1985). In this case, the existence of a prior oral contract depended on the intentions of Hooper and Goldsmith. Regardless of whether one takes a more subjective, or a more objective, approach to intention, determining that intention involves considering the credibility of witnesses, weighing competing, plausible inferences that can be drawn from events and documents, separating the significant testimony and documentary evidence from the insignificant, and other "factual" inquiries that are better performed by the trial court, either with or without the help of a jury. *See Nigro v. Conti,* 319 Mass. 480, 66 N.E.2d 353, 354 (1946) (intention of parties is a question of fact); *see also* 1 *Corbin* § 29, at 87–88 (1963) ("A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to one another, a question of fact."). *RCI Northeast Services Division v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987) (it is the factfinder "who must ferret out the intent of the parties").

*The Effective Date of the Contract*

■ Parties do not become contractually bound until they mutually assent to bind themselves to an agreement. *See* 1 *Williston on Contracts* § 18, at 32 (3d ed. 1954). Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do. Here, Hooper's "intention" is what Goldsmith would have reasonably understood that intention to be, and not what Hooper thought he intended at the time, nor what Hooper later said he intended. Parties can agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate. *See Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551, 553 (1941); *see also* 1 *Corbin* § 30, at 97.

Hooper, Salem's president, had every incentive to think that he and Goldsmith meant to be legally bound as early as August, because he wanted very much to sell an unprofitable enterprise. And Goldsmith, Hooper's longtime business and social acquaintance, has nothing to lose *at this point* by agreeing. In the rosy afterglow of an amicable sale, it is easy to think

that words spoken in August sealed a deal that was not signed until the end of September. The question before the district court, however, was the parties' understanding *prior* to signing the agreement.

In this situation the written agreement itself has great significance, as the district court recognized. How that document is written can determine whether it was meant as a written memorialization of an earlier contract, or an agreement enforceable only upon execution. The district court found it particularly relevant that the execution of the written agreement started the clock running on the performance of two provisions of the contract, a lease/service arrangement and the use of the present identification on the trucks to be sold. The district court found that these timing provisions made the date of signing itself a material term of the contract, strongly suggesting that the written agreement was more than a "mere memorial of [a] contract already final by the earlier mutual assent of the parties." *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 195 N.E. 323, 325 (1935).[1]

That finding was not clearly erroneous. The conduct of the parties throughout the negotiations supports an inference that they did not intend to be bound until a formal document was executed. *See* 1 *Corbin* § 30, at 97. Both Hooper and Goldsmith testified at trial that theirs was a complex deal. They drafted agreements as early as August and amended their drafts as late as September 24 or 26. *See Tull v. Mister Donut Development Corp.*, 7 Mass.App. 626, 389 N.E.2d 447, 450 (1979) ("Normally the fact that parties contemplate the execution of final written documents justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled."). Neither party performed any element of the agreement prior to the signature date. Although Whyte's

placed a verbal order for a piece of machinery on September 16 that it needed to do the new work, that purchase order was not called for by the agreement. The purchase order may be explained as an indication that Goldsmith felt the negotiations were going so smoothly that there was little risk the deal would fall through. Had the situation changed substantially to Goldsmith's detriment, it is not clear that he could not simply have cancelled the machinery purchase order; it is even more dubious a proposition that he would have wanted it to have bound him to purchase Salem's business.

The decision of the district court is *affirmed*.

---

1. The district court mistakenly stated in its bench ruling that the date on which the agreement was signed triggered the running of the sixty weekly payments. This mistake does not undercut its finding, however. The signature date *was related* to the sixty week period, because the beginning of the sixty week period was pushed back when the negotiation and drafting of the agreement continued on into late September. And, the district court's underlying point, that the date of the agreement was an important term of the contract, is still valid.