Luis **RAMIREZ**, et al., Plaintiffs,

v.

**Austin J. DECOSTER, d/b/a/ Decoster Egg Farm, et al., Defendants.**

**Civil No. 98–186–P–H.**

United States District Court,
D. Maine.

June 1, 2001.

Harold J. Friedman, Karen Frink Wolf, Friedman, Babcock & Gaythwaite, Portland, ME, for Luis Ramirez, Servando Campos, Isidro Portales, Genaro Romo Rodriguez, Jose R. Hernandez, Ester Hernandez, Edgar Elizondo, Maria Elizondo, Lauro Garcia, Dora Garcia, Elda Hernandez, Juan Ramon Hernandez.

Timothy J. O'Brien, Verrill & Dana, Portland, ME, Jeffrey A. Schreiber, Schreiber & Associates, P.C., Danvers, MA, John J. McGivney, Rubin & Rudman, LLP, Boston, MA, for Austin J Decoster, Maine Contract Farming, LLC.

Thomas H. Somers, Kerin E. Stackpole, Bergeron, Paradis & Fitzpatrick, Burlington, VT, for Quality Egg of New England, Maine Ag.

### MEMORANDUM DECISION AND ORDER

HORNBY, Chief Judge.

After a grueling day of mediation in a putative class action, the lawyers and those clients who were present agreed on the most important disputed issues. The mediator then drafted a statement of the terms they had accepted. All recognized that, since the lawsuit purported to be a

class action, any settlement agreement would have to be detailed and in writing to obtain court approval. *See* Fed.R.Civ.P. 23. As the mediator's version was circulated for signature, one of the defendants' lawyers added the following clause: "This mediation agreement contemplates that a written Settlement Agreement will be executed upon agreement to all material terms." During the succeeding weeks, the lawyers drafted a detailed and comprehensive settlement agreement. But the defendants failed to provide what the plaintiffs deemed acceptable security for the financial installment obligation the defendants had agreed to. After a succession of court deadlines passed with no written settlement agreement filed for court approval, I issued decisions on pending motions. The decisions altered the parties' respective negotiating positions. As a result, the defendants now refuse to go forward with the purported settlement. The plaintiffs have brought this motion to enforce the alleged agreement. Upon a *de novo* review and after an evidentiary hearing, I agree with the Magistrate Judge that the agreement is enforceable.

## I. FACTS

The factual allegations of the Amended Complaint are described extensively in earlier rulings. *See, e.g.,* Order on Pls.' Mot. for Class Cert. and Defs.' Mot. for Summ.J. (Mar. 31, 2000) ("Order of March 31, 2000") (order denying class certification and granting most of defendants' motion for summary judgment) at 3. For this motion, suffice it to say that the plaintiffs seek to represent a class of Mexican or Hispanic workers at the DeCoster egg farms. They charge DeCoster with racial/ethnic discrimination and a variety of other federal and state law violations. *Id.* At an early stage I granted the defen-

dants' motion to dismiss the government of Mexico, a ruling that was on appeal at the time of the mediation. Order on Defs.' Mot. to Dismiss Pl. Estados–Unidos Mexicanos, at 1 (Aug. 9, 1999) (order granting motion to dismiss government of Mexico). Difficult motions for class certification and for summary judgment also were filed and were pending at the time of mediation. *See* Order of March 31, 2000, at 2–3.

After I had invested substantial time and energy in working on the issues raised by the motions, the parties notified me that they were engaged in substantive and promising settlement negotiations. As a result, they asked me several times to delay ruling on their motions, and I consented. Order on Mot. to Stay Any Further Action on the Case Pending Mediation (Jan. 10, 2000).

In fact, the parties had engaged former United States Senator Rudman to mediate their dispute. Senator Rudman presided at a full day of mediation on February 21, 2000, here in Portland. Evidentiary Hearing ("Evid.Hr'g") Ex. 34 (Test. of Senator Warren B. Rudman) at 2–3 ("Rudman Test."); Evid. Hr'g Tr. at 76 (Test. of Att'y Karen Wolf); Tr. at 157–58 (Test. of DeCoster Att'y Timothy O'Brien). Austin DeCoster, the principal defendant, was present; so were one of the named individual plaintiffs, Luis Ramirez, and two representatives of the government of Mexico. Rudman Test. at 39–40; Tr. at 16 (Test. of Att'y Wolf). There were three lawyers, a paralegal and an interpreter (who was also a migrant labor organizer) for the plaintiffs; five lawyers for DeCoster; and a nonlawyer representative for the non-DeCoster defendants.[1] *Id.* at 16, 24–25.

Toward the end of a long day of intensive mediation (the majority of it was

---

1. I described the relationships among the various defendants in my Order of March 31, 2000. Order on Pls.' Mot. for Class Cert. & Defs.; Mot. for Summ.J. at 2 n. 1.

spent on financial terms, Rudman Test. at 2–3), the parties reached agreement on the amount of settlement and certain other matters. *Id.* at 21; Tr. at 18 (Test. of Att'y Wolf), 159–60 (Test. of Att'y O'Brien). Senator Rudman dictated to a paralegal the terms he believed the parties had agreed on as follows:

> In the matter of *Estados Unidos Mexicanos et al. v. Austin J. DeCoster, et al.*
> Agreement reached under the auspices of mediation by Senator Warren B. Rudman on February 21st, 2000 in Portland, Maine.
>
> 1. Plaintiffs agree to settle this matter against all Defendants for the sum of *$6* million dollars.
>
> 2. Payments shall be as follows:
>
>    $1.5 million upon approval of the Court
>
>    $4.5 million over a period of 24 months
>
> 3. The Plaintiffs agree to use their best efforts to help lift the boycott of De-Coster with the various retail establishments.
>
> 4. Consideration will be given to rehiring certain former employees of De-Coster.
>
> 5. Parties agree to make a good faith effort to deal with other collateral but not financial issues with the Court.

When the document was passed around, DeCoster attorney McGivney added a sentence:

> 6. This mediation agreement contemplates that a written Settlement Agreement will be executed upon agreement to all material terms.

Evid. Hr'g Ex. 1 at 1–2. Attorney Wolf signed the document for the plaintiffs; At-

torney Schreiber signed for the defendants; and Senator Rudman signed as Mediator. *Id.*

After Senator Rudman left to catch a plane, the lawyers tried to proceed with their negotiations, but discovered they were too exhausted. Tr. at 30–33 (Test. of Att'y Wolf). They resumed the next day at 11:00 a.m., the plaintiffs bringing a draft of another document. *Id.* at 32–33. After some progress, they adjourned, with the defendants' lawyers promising to draft a comprehensive document for presentation to the Court. *Id.* at 33–34. Negotiations went on thereafter by phone, fax and mail. *See, e.g.,* Evid. Hr'g Ex. 5 (Letter from Att'y Schreiber to Att'y Friedman, Mar. 6, 2000); Evid. Hr'g Ex. 9 (Fax from Att'y Friedman to Att'y O'Brien, et al., Mar 22, 2000); Evid. H'rg Ex. 13 (3/27/00 Draft Settlement Agreement).

As the date approached when I was required by statute to report publicly the pending motions as having been under advisement for more than six months, *see* 28 U.S.C. § 476 (Civil Justice Reform Act), I told the parties that the succession of consented-to delays would have to come to an end. Tr. of March 10, 2000 Conference at 2; Tr. of Mot. to Enforce at 49–50 (Cohen, Mag. J., Sept. 13, 2000). Although the lawyers continued to tell me and/or the Court's case managers that settlement was imminent, Tr. of March 10, 2000 Conference, they did not file a written settlement agreement. At one conference of counsel, they told me that they had agreed upon the most difficult aspect of the settlement—money and that they were very hopeful of resolving everything. Tr. of Mot. to Enforce at 31 (statement by Att'y O'Brien), Tr. at 194 (Test. of Att'y O'Brien).[2]

---

2. I am aware that Attorney Wolf testified that they told me that the case was settled, Tr. at 38 (Test. of Att'y Wolf), and I believe she is sincere in making that statement because, in her mind, the case was settled and that is what they were trying to convey to me. As I

On March 27, 2001, DeCoster attorney Schreiber told plaintiff attorney Wolf that she "could just call the Court and tell them the case was settled." Tr. at 46 (Test. of Att'y Wolf). Attorney Wolf did not do so. After waiting until the last possible time,[3] I proceeded to rule on March 31, 2000. Order on Pls.' Mot. for Class Cert. & Defs.' Mot. for Summ.J. at 2–3. Although each side won some and lost some portion of the rulings, the balance favored the defendants. *Id.* Not surprisingly, the defendants no longer endorse the terms of the purported settlement. Defs.' Opp'n to Pls.' *In Camera* Mot. to Enforce Settlement Agreement (July 24, 2000) ("Defs.' Opp'n"). The plaintiffs do. Pls.' *In Camera* Mot. to Enforce Settlement Agreement (July 7, 2000) ("Pls.' Mot. to Enforce").

On July 7, 2000, the plaintiffs brought a motion to enforce settlement. Pls.' Mot. to Enforce at 9–11. The defendants opposed it. Defs.' Opp'n at 9–10. After full briefing and oral argument, Magistrate Judge Cohen recommended that the motion be granted. Recommended Decision on Pls.' Mot. to Enforce Settlement (Cohen, Mag.

J., Sep. 18, 2000) ("Rec.Dec.") at 1, 24 (recommending enforcement of Feb. 21, 2000 agreement). On review, I concluded that the better course was to hold an evidentiary hearing before ruling. *See Malave v. Carney Hosp.,* 170 F.3d 217, 220 (1st Cir.1999); *Dankese v. Defense Logistics Agency,* 693 F.2d 13, 16 (1st Cir.1982); *Warner v. Rossignol,* 513 F.2d 678, 683 (1st Cir.1975). Testimony was taken on three days (one day by videoconference from Washington, D.C., where the lawyers and Senator Rudman appeared while I presided from the courtroom in Portland). Evid. Hr'g Ex. 34 (Rudman Test.); Evid. Hr'g Tr. Jan. 22–23, 2001.

## II. ANALYSIS[4]

The parties have analyzed this settlement issue in terms of Maine law. The Magistrate Judge considered both federal and Maine law. Rec.Dec. at 5. A recent First Circuit decision makes clear that federal law must be applied where, as here, the underlying lawsuit is based upon federal statutes. *Quint v. A.E. Staley Mfg. Co.,* 246 F.3d 11, 14 (1st Cir.2001); *see also*

---

have told the lawyers, I do not have an independent recollection of what they told me at that conference. I credit Attorney O'Brien's more qualified version of what words were actually used, Tr. at 194 (Test. of Att'y O'Brien), because if I had believed the case was then settled, I would not have proceeded to finalize my decisions on the pending motions.

3. At one point late in the process, the lawyers requested my assistance in resolving the parties' dispute. Tr. at 49 (Test. of Att'y Wolf); Evid. Hr'g Ex. 17 (Letter from Att'y McGivney to Att'y Wolf, Mar. 30, 2000). I declined the request because I thought they were unnecessarily temporizing. I was unaware of their written document that provided for seeking court assistance, and they did not inform me that the request was pursuant to an agreement they had reached with the mediator. Tr. at 31 (Test. of Att'y Wolf).

4. I will deal with only the DeCoster defendants. The nonDeCoster defendants were not present at the mediation, and did not sign the mediation agreement, and the plaintiffs subsequently dismissed them voluntarily from the lawsuit. Stipulation of Dismissal, June 28, 2000 (voluntarily dismissing nonDeCoster defendants); Tr. at 125–27, 134–36 (Test. of Att'y Wolf). I therefore no longer have jurisdiction over them. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). As a result, I do not have before me their argument that allocation of the financial responsibility among the defendants was a material issue not addressed in the agreement. *In Camera* Objs. of Non–DeCoster Defs. to Maj. J.'s Proposed Findings and Recommendation on Pls.' Mot. to Enforce Settlement Agreement and Request for *De Novo* Review & Incorp. Mem. of Law, at 7–8 (Oct. 4, 2000).

*Malave,* 170 F.3d at 220. I therefore limit my attention to federal law.[5]

According to the First Circuit, "[the] argument, that when the parties to an agreement contemplate a written document will memorialize a contract, there can be no agreement until the document is executed, is a radical and doomed departure from the principles of contract law.... [T]hat is not the law." *Quint,* 246 F.3d at 15. Dealing with an oral agreement, the First Circuit went on to explain that "[t]here are certainly instances in which no ... contract is formed where material terms are not yet agreed upon, and no agreement is reached until there is written agreement embodying those material terms." *Id.* For that proposition, it cited an earlier case that had stated: "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement. Courts determine that mutual assent, not on the basis of what goes on inside the parties' heads, but rather on the basis of what they say and do." *Salem Laundry Co. v. New Eng. Teamsters & Trucking Indus. Pension Fund,* 829 F.2d 278, 280 (1st Cir.1987) (citations omitted); *accord Abbott Lab. v. Alpha Therapeutic Corp.,* 164 F.3d 385, 387 (7th Cir.1999). I apply those principles here, where I am the factfinder.[6] *Salem Laundry,* 829 F.2d at 280 (noting that trial court must inquire into intent of the parties); *RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987) (noting that the factfinder "must ferret out the intent of the parties").

### A. Material Terms

Some things were clearly resolved in the first writing at the close of the February 21 day of mediation. The document resolved the amount the defendants would pay in compromise; the schedule for payment; a best efforts commitment by the plaintiffs to help lift a boycott that certain retailers had imposed; and a good faith commitment on both sides in dealing with the Court on nonfinancial issues. Evid. Hr'g Ex. 1. (No issue has been made of the clearly precatory agreement to give "consideration" to rehiring.) But the defendants say that the following material terms were not agreed upon: (a) the definition of "best efforts"; (b) the scope of the plaintiff class; and (c) the nature of any security for the installment payments. Tr. at 170–71 (Test. of Att'y O'Brien).[7] I consider each separately.

5. Where the underlying lawsuit is in federal court because of federal question jurisdiction, the presence of pendent or supplemental state law counts (as there are here) cannot change the applicability of federal law to efforts to settle the lawsuit. Otherwise, different principles would apply to different counts, and a settlement agreement designed to settle an entire controversy could be enforceable as to some counts and not enforceable as to others, an impossible outcome.

6. No party has suggested that a jury should decide the issue. The plaintiffs argue that I should affirm the *Magistrate* Judge without an evidentiary hearing, arguing that the defendants waived any right to an evidentiary hearing by not requesting either an evidentiary hearing or oral argument in opposing the motion to enforce and only raising the issue at oral argument in front of the Magistrate Judge. Pls.' *in camera* Mem. of Law in Opp'n to Defs.' Obj. to Mag. Judge's Rec.Dec. on Pls.' Mot. to Enforce Settlement Agreement at 17–19 (Oct. 23, 2000). It certainly would have been better practice for the defendants to have requested an evidentiary hearing earlier. As it developed, on the affidavits submitted, the Magistrate Judge found no factual disputes. Rec.Dec. at 5. But certainly the inferences to be drawn were conflicting. In light of the First Circuit caselaw I have cited earlier in text, I have decided therefore to resolve the dispute on the basis of the evidentiary hearing.

7. During the litigation over the motion to enforce, at various times other issues have been posited as material: administration of

### (1) Best Efforts

■ The DeCoster defendants argue that lifting the boycott is an exceedingly important part of the agreement to them because the potential for ending the retailers' boycott of DeCoster eggs is what justifies the amount of money DeCoster agreed to pay in order to settle. Tr. at 170–71 (Test. of Att'y O'Brien); DeCoster Defs.' *in camera* Obj. to Mag. Judge's Rec.Dec. on Pls.' Mot. to Enforce at 16–17 (Oct. 5, 2000) ("DeCoster Defs.' Obj."). I accept that assertion, but it remains the case that continuation of the boycott is in the control of third parties, not the plaintiffs. The plaintiffs cannot guarantee a favorable outcome under any language that might be drafted. They can only give "best efforts." With time, more content and detail might have been added to what is included within the phrase "best efforts," but the standard could not be more demanding than that. In fact, as Magistrate Judge Cohen observed, "best efforts" is a familiar term to lawyers and not unusual to find in a contract. Rec.Dec. at 9 n. 7; Tr. of Mot. to Enforce at 43; *see Triple–A Baseball Club Assoc. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987) (enforcing parties' agreement to use "best efforts" to obtain approval of purchase of baseball franchise); *Satellite Broadcasting Cable, Inc. v. Telefonica de Espana*, 807 F.Supp. 210, 212 (D.P.R.1992) ("Where the party includes in the contract a best efforts clause, the same will be given effect."). Compliance with or breach of the "best efforts" clause could be determined without further enumeration of what the parties contemplated.[8] *See Triple–A Baseball*, 832 F.2d at 225 (noting that "best efforts" standard has been held to be equivalent to that of good faith).

### (2) Scope of Plaintiff Class

The defendants argue that the agreement signed at the close of mediation does not specify the scope of the class. DeCoster Defs.' Obj. at 15–17; *see also* Defs.' Opp'n at 11. In fact, however, the scope of the class had never been an issue during the mediation. After all, a motion for class certification had been filed, and the entire dispute arises out of employment and housing relationships between the plaintiffs and the DeCoster defendants. The only "scope" issues possible were defining the ethnic group and the chronological years covered. It was in the defendants' interest to have as broad a definition as possible for all the obvious reasons. Although there was some later suggestion by the plaintiffs to limit the class to plaintiffs of Mexican origin, Tr. at 174–75 (Test. of Att'y O'Brien), when the defendants objected, the plaintiffs' lawyers quickly agreed to the defendants' definition that included all Hispanic plaintiffs. *Id.* at 236.

the class fund; the nature of any press conferences to announce the settlement; and apportionment of the monetary payment among the defendants. Rec.Dec. at 9. For the reasons articulated by the Magistrate Judge, I find that none of these was material. Rec.Dec. at 10–13.

**8.** Or, as Senator Rudman put it in his testimony,

Q. [D]oes this agreement reflect except for financial security the material concerns of each party with respect to a settlement agreement?

A. Yes, with one proviso. I thought there might be an ability to expand the best-efforts language of paragraph three in the boycott.

Q. And when you say, "expand that effort," in what context?

A. By giving it specificity. The people who were involved here would do A, B, C, D, E, F, and G, that you would actually have it. I thought it might be spelled out more, which is—but if it wasn't, this would stand. It's kind of an easy one to walk away from, but it was there.

Rudman Test. 37–38.

This topic was not mentioned in the agreement only because it was not a matter of dispute between the parties.[9]

### (3) Security for the Installment Obligation

■ The agreement that Senator Rudman drafted does not mention any security for DeCoster's installment obligation. *See* Evid. H'rg Ex. 1. (The reference to "collateral" in paragraph 5 is in its adjectival sense of auxiliary or secondary, not as a noun meaning security.) But the subject came up toward the end of the day of mediation, when DeCoster first proposed an installment payment as he increased the amount he was willing to pay to settle. Tr. at 20–21 (Test. of Att'y Wolf), 177 (Test. of Att'y O'Brien). According to Senator Rudman, whose testimony I credit as a neutral observer:

> [T] here was an intensive discussion about securitizing the 4.5 million dollars that would be outstanding for, I recall, 24 months. There was a discussion that the parties would get together subsequent to the mediation and try to find a satisfactory way of doing that.
>
> ***
>
> This was kind of at the end of all of this, and once it became apparent this would not be a cash outright settlement, an outright cash settlement, you [referring to plaintiff attorney Friedman] expressed concern about that. And so I asked the parties, I asked Mr. Decoster's counsel—and I might say he was sitting essentially two chairs away from me at that time or three chairs away—that could they come up with any idea then and there in which they could outline a piece of property or a security interest or something that we could incorporate in the agreement.
>
> I asked the question, I recall that, and it was obvious that they could not, and I believe Mr. DeCoster himself indicated that his corporate holdings were fairly complex. He did not have in his head how much equity there might be in a particular piece of real estate or other real or personal property, and thus

---

9. A second issue concerning the class relates, not to the existence of an agreement among the parties, but to whether a class action settlement is any longer possible in light of the fact that I have subsequently denied the motion to certify the class. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. at 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Contrary to the defendants' argument, my later decision not to certify the class does not automatically prevent a settlement class (except perhaps for the fraud and breach of contract claims where I found that Rule 23(a) was not satisfied). Order of March 31, 2000 at 12–13. The Supreme Court has held that classes cannot be certified solely for settlement purposes where the class does not meet the requirements of Rule 23(a), especially the elements of the Rule designed to protect absentees. *Id.* But the Court also made clear in that decision that, when reasons of practicality in managing a trial lead to the refusal to certify a class under Fed.R.Civ.P. 23(b)(3), it does not necessarily follow that a settlement class cannot be certified: "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed.R.Civ.P. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule ... demand undiluted, even heightened attention in the settlement context." *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231. That is the case here. My reasons for refusing to certify under 23(b)(3) were based largely upon the difficulties of managing the resulting jury trial. *See* Order of March 31, 2000 at 7–8. Those difficulties are not presented in 'a settlement. From all that appears, the class here meets the other requirements of the Rule. (I will not determine that issue finally until I rule on a properly presented settlement document.) Moreover, even if it turns out later that there is some impossibility of performance (always a risk), that eventuality does not preclude a finding that the defendants stand in breach of the agreement now.

there would be discussions subsequent, and I understood that. No reason he should know that at the time, and that is why it was not specified. I would have preferred to, but, obviously, we could not do that.

Q. By "specified" you mean articulated in the writing?

A. Yes. I would like to have specified a farm located in Bridgton, Maine, or whatever. . . .

Rudman Test. at 12–14.

But subsequently on February 21, 2000, the parties did get together, apparently outside of Senator Rudman's presence. Tr. at 21, 36 (Test. of Att'y Wolf), 177 (Test. of Att'y O'Brien). The defendants agreed orally that day that DeCoster would in fact provide security for the obligation—the words used were "adequate security," Tr. at 21 (Test. of Att'y Wolf); Tr. of Mot. to Enforce at 36 (Statement of Att'y O'Brien)? but the amount and nature were not defined.

On this topic, I agree with the Magistrate Judge that the nature of the security is not a material term. Rec.Dec. at 14 ("[T]he nature of [the] security . . . . is not integral to the settlement itself."). Moreover, the requirement of "adequate securi-ty" is enforceable in any event. Applying that standard is the typical sort of dispute that courts are called upon to resolve.[10]

So no material terms were missing from the agreement. Indeed, the absence of material terms is largely a makeweight set of arguments. The DeCoster defendants' more serious argument is their contention that Attorney McGivney's insertion of paragraph 6 in the February 21 document meant that any apparent "agreement" Senator Rudman had achieved was illusory and unenforceable. Def. DeCoster Obj. at 14–15.

### B. Was a Further Writing Required to Make the Agreement Enforceable?

■ As I said at the outset, the First Circuit has determined that existence of an enforceable agreement is to be resolved by the factfinder. *Salem Laundry Co.,* 829 F.2d at 280. I must determine factually whether there was mutual assent to be bound at the close of mediation, and I must determine that, not by what was in people's heads, but objectively by what they said and did. *Id.* I therefore examine the evidence from that perspective. I observe first that the lawyers who were present at the mediation and who testified in court are heavily invested in the outcome

---

**10.** In fact, what happened here is that the plaintiffs' lawyers kept asking for higher quality security (a bond) in the face of DeCoster's offer to provide only a second mortgage on his already highly leveraged Turner farm property. Evid. Hr'g Exs. 10 (Letter from Att'y Friedman to Att'ys McGivney and Schreiber, Mar. 27, 2000), 11 (Letter from Att'y Schreiber to Att'y Friedman, Mar. 27, 2000). On the morning the rulings would issue, the lawyers recognized that they had only two remaining issues, Tr. at 180 (Test. of Att'y O'Brien)—the form of press conferences announcing the settlement, a matter easily resolved (Attorney Wolf testified credibly that she told Attorneys Schreiber and O'Brien that there was no remaining dispute as to the public comment and public disclosure issues, Tr. at 67 (Test. of Att'y Wolf)), and the security. The plaintiffs offered to pay one-half the $130,000 cost of a bond, Tr. at 67 (Test. of Att'y Wolf), 180 (Test. of Att'y O'Brien), but DeCoster refused to contribute anything toward the posting of a bond, and left the plaintiffs only the two options of the second mortgage or paying for the bond themselves. *Id.* at 67 (Test. of Att'y Wolf), 180–81 (Test. of Att'y O'Brien). That is where matters stood when the deadline passed and I issued my Order on the pending motions. (Later, in a letter of May 22, 2000, the plaintiffs' lawyers agreed to drop the requirement of a bond for the settlement agreement. Evid. Hr'g Ex. 22 (Letter from Att'y Friedman to Att'y O'Brien, May 22, 2000) at 1.)

of this dispute for powerful financial and emotional reasons. I do not for a moment suggest that any of them testified dishonestly; they are all professionals of the highest standing. But I do believe that their understandings and recollections are inevitably colored by the passion of their participation. I find Senator Rudman, the mediator, to be the most neutral and dispassionate observer of what was said and done.

1. Senator Rudman testified that he had concluded from what he saw and heard that the parties had reached a settlement. Rudman Test. at 21. In confirmation, the document begins by calling itself "Agreement ...," Evid. Hr'g Ex. 1 at 1, and its first provision states: "Plaintiffs agree to settle this matter against all defendants for the sum of *$6* million dollars." *Id.*

2. As I told the lawyers, I have no independent recollection of the words they used in speaking to me at various case conferences. The case managers testified that they understood from communications from the lawyers that a settlement was imminent, but that they never received the final confirmation from counsel that it had occurred, a message that would have prompted them to issue a procedural order. Tr. at 145–46 (Test. of Case Mgr. Marie Cross), 151–52 (Test. of Case Mgr. Deborah Whitney).

3. There is no evidence of what the class plaintiffs said and did that bears upon the issue. Only one class representative was present at the mediation. Tr. at 16 (Test. of Att'y Wolf); Rudman Test. at 40. According to Attorney Wolf's testimony, this plaintiff expressed concern to Senator Rudman about having been terminated in retaliation for his complaints and a desire to be reinstated. Tr. at 28 (Test. of Att'y Wolf). As a result, Senator Rudman inserted the provision that "consideration" would be given to reinstatement. *Id.* at 28–29. The representatives of the government of Mexico were well aware of what they were agreeing to and discussed with the defendants what Mexico could and could not do under the "best efforts" commitment. *Id.* at 25–26.

4. Austin DeCoster himself was present throughout the daylong negotiations. *Id.* at 16; Rudman Test. at 39. Senator Rudman testified that at the end of the day, DeCoster told Senator Rudman that the Senator had done a good job and that he, Austin DeCoster, had agreed to pay what was probably too much. Rudman Test. at 20–21, 42–43. Although I continued the evidentiary hearing on one occasion to permit DeCoster himself to testify about the negotiations, he ultimately chose not to.

5. One of the plaintiffs' lawyers, Karen Wolf, testified in detail. Tr. at 12–137. Her testimony about the mediation day was consistent with that of Senator Rudman. She also testified that the lawyers told me on March 10 that the case had settled, Tr. at 38, but I find that to be an overstatement of what was told me that day for the reasons set forth *supra* at n. 2. She testified about her intent in sending various letters to defense counsel over the days between February 21 and March 31 and also telephone conversations. *See, e.g.,* Tr. at 76, 80–81, 86–87.

6. One of the DeCoster defendants' lawyers, Timothy O'Brien, also testified in detail. Tr. at 154–245. He testified about the events of the February 21 mediation in a manner consistent with the testimony of Senator Rudman and that ultimately on February 21 DeCoster agreed to provide adequate security. Tr. at 177; *see also* Tr. of Mot. to Enforce at 36. He explained the importance of favorable publicity and a joint press conference to DeCoster's business circumstances. Tr. at 188–192. He

also testified about the negotiations between February 21 and March 31. *See, e.g., id.,* at 172–187.

7. Another of the DeCoster defendants' lawyers, John McGivney, also testified in detail. Tr. at 246–282. He testified about the mediation proceedings and his concern when he heard Senator Rudman dictating an agreement, considering it to be unnecessarily dangerous. *Id.* at 250–52. He testified that he, Attorney McGivney, personally avoided signing the agreement and, when he saw that Attorney Schreiber would sign it, arranged to insert paragraph 6 into the document so as to, in Attorney McGivney's mind, prevent it from becoming a settlement agreement. *Id.* at 251–52. He also testified about the negotiations between February 21 and March 31, an unprofessional telephone call exchange on March 28 where the negotiations were disrupted (Attorney Wolf also testified about this incident), and what happened thereafter. *Id.* at 256–66.

8. Senator Rudman's best recollection of how paragraph 6 came to be added is as follows:

> [W]e had come to the agreement, and we were sitting drafting it, and one of the counsel said, "you know, we are going to need a more formal settlement agreement. There are collateral things here that we have to wrap up, and we ought to be able to wrap them up. And this paper itself we can't give to Judge Hornby. So let's get together in the next few days and put together a settlement agreement." That was essentially the conversation that was had.

Rudman Test. at 41–42. I credit this account for the reasons I have already stated.

What I find from all this is that Austin DeCoster thought he had agreed to a settlement, plaintiffs' lawyer Wolf thought there was agreement, as did the plaintiff representatives who were present, and Senator Rudman thought there was agreement. Attorney McGivney thought he had created a loophole by inserting paragraph 6, Tr. at 250–53 (Test. of Att'y McGivney), but Attorney McGivney did not express aloud to the others what it was he was doing. Certainly the insertion of paragraph 6 did not *create* additional unagreed-to material terms. I find therefore that the parties had agreed on all material terms. Moreover, they expressed to each other and to Senator Rudman that they had reached agreement, whatever Attorney McGivney thought internally. Rudman Test. at 19–20, 42–43. Those words and conduct created a binding agreement. All the lawyers and Senator Rudman recognized that a formal written document must be prepared in order to secure court approval, but that was basically a scrivening exercise, with a good faith obligation attached. That was the reasonable objective interpretation of paragraph 6. The intent to be bound was made manifest, and paragraph 6 did not expressly condition the effectiveness of the deal on execution of a later, more comprehensive, document. The February 21 agreement was, therefore, binding. *See Abbott Lab.,* 164 F.3d at 388–89 ("[I]nformal writings between parties can constitute a binding settlement agreement unless the parties decide to *expressly condition* their deal on the signing of a formal document. This is an accurate statement of the rule, but informal writings must still manifest each party's intent to be bound by the material terms proposed.") (emphasis added).

It is important not to lose sight of the fact that this was a lawsuit essentially about money. Once the money issue was resolved, everything else could be expected to fall into place after some pushing and shoving. Subsequently, the plaintiffs pushed too hard for security, and I was

insufficiently flexible in permitting extensions of time, but those subsequent events do not change the fact that as of the close of the mediation day, there was an enforceable agreement.[11]

### C. Repudiation

■ There is one final issue. If there was an enforceable agreement at the end of February 21, 2000, did the plaintiffs later repudiate it in statements and actions leading up to March 31, such that the defendants were entitled to treat the settlement agreement as no longer in effect once the Court issued its March 31 Order? The defendants did not raise this argument in their papers before Magistrate Judge Cohen. They raised it only after he ruled against them. That is too late and amounts to a waiver of the argument. *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 & n. 3. (1st Cir.1998) ("The district court is under no obligation to discover ... new legal theories for a party challenging a report and recommendation issued by a magistrate judge. There is no indication that the magistrate judge was ever alerted to the legal theory belatedly asserted by plaintiffs ... before the district court."); *Borden v. Secretary of Health & Human Servs.,* 836 F.2d 4, 6 (1st Cir.1987) ("[T]he district court judge properly refused to

---

11. Senator Rudman's understanding of what happened is as follows:

> And so the purpose for that [paragraph 6], as you know, no court would accept this document as a settlement agreement or what I would call in New Hampshire a stipulation of the parties to settle, and that's why that was there.
>
> So there certainly was an agreement within the four corners of this document, I thought, but there certainly was an agreement to agree on a future document which would, in fact, fine-tune whatever needed fine-tuning, particularly the securitization, and if there needed to be an expansion of paragraph three. That's the best answer I could give you.
> ***
> Q. And does that suggest to you that there were certain material terms that were not contained in paragraphs one to six of the February 22 ... agreement?
> A. Yes, it did. That's why—obviously, there were other issues that I was not privy to, but I didn't know what they were.
> Q. And to your knowledge the material terms that had yet to be agreed to, did they include the boycott dispute?
> A. They included it to the sense, sir, that I didn't think our language in paragraph three was expansive enough to satisfy what Mr. DeCoster would have eventually liked. On the other hand, people were willing to sign it. And on its face it says, "People use their best efforts."
> I don't know how you ever get people to do more than that. But the answer is, yes,

> I thought there would be two—my understanding was there would be two things that will be addressed and that paragraph six called for a stipulation. A would have been a precise securitization, which would have ensured they would be paid. And B would be, if possible, a fine-tuning of paragraph three.
> ***
> Q. So it's fair to say, Senator, that unless there was a written settlement agreement executed and presented to the Honorable Judge Hornby there would be no settlement of the matter?
> A. I'm not sure there would be a settlement or not or there would be action or not, but certainly there wouldn't be an agreement presented to court, and that's a legal conclusion, Mr. [Knowles]. I don't know the answer.
> I know the background because you have both sent me all the documents, and I have no idea of the status of this particular document. But I do know that I thought you reached an agreement on money, which was the key issue, and boycott was a key issue, and there were some other collateral issues which you had to have an agreement on. That's all I know.
> I don't know any more about it. And I really don't want to get on either side of this argument. I am trying to be right down the middle with my recollection of the facts, which is all I really recall.
> Rudman Test. at 24–32

consider an argument which could have been, but inexplicably was not, presented to the magistrate in the first instance."); *Singh v. Superintending Sch. Comm. of Portland,* 593 F.Supp. 1315, 1318 (D.Me. 1984) ("On referral of a pretrial motion to the Magistrate for his hearing and determination thereon, all parties are required to take before him, not only their best shot but all of their shots.").

In any event, I agree with Magistrate Judge Cohen's analysis of the post-February 21 statements and conduct (apart from what was said to me about the settlement at the March 10 conference, *see* n. 2, *supra* ). Rec.Dec. at 14–22. Specifically, the lawyers on both sides were posturing; the plaintiffs never said "we're out of the agreement"; instead, the lawyers were working diligently with clients who were sometimes difficult to reach or pin down, and the lawyers simply watched in frustration as the Court's deadline passed before they were able to produce the detailed written document required. *See* Restatement (Second) of Contracts § 250, Comment, at 273 (1981) ("Mere expression of doubt as to his willingness to perform is not enough to constitute a repudiation"). No party *repudiated* the agreement before I ruled on March 31.[12]

I likewise find no repudiation by the plaintiffs in the delay before they filed their motion to enforce. My orders were issued on March 31, 2000. Obviously, the lawyers had to consult with their clients, the government of Mexico and the repre-

sentative class plaintiffs; they also had to prepare their motion for reconsideration of the March 31st Order; they had to review the documents and events that had occurred in the congested time period between February 21, 2000 and March 31, 2000. They alerted the defendants and the Court to what was coming on May 22, 2000, in the letter to the defendants' lawyers withdrawing the bond demand and their references at a conference that day with Magistrate Judge Cohen. There was no delay here that amounted to a repudiation of the agreement. *See Thermo Electron Corp. v. Schiavone Const. Corp.,* 958 F.2d 1158, 1164 (1st Cir.1992) (noting that delay will repudiate a contract only if the plaintiff "unreasonably delayed" performing); Restatement (Second) of Contracts § 250, Illustr. 8, at 275 (1981) (noting that delay constitutes repudiation only if the delay would entitle the party to damages for total breach).

### III. CONCLUSION

It should go without saying that the settlement agreement still must secure court approval under the strictures of Rule 23. The parties have not yet addressed themselves to all the intricacies of that rule. And perhaps ultimately they will be unable to meet all the requirements. All I am deciding now is that the defendants are currently in breach of a contractually enforceable agreement. If the agreement turns out to be unenforceable for other, Rule-related, reasons, I will have to address those issues then. But if for reasons

---

**12.** The matter was also undoubtedly complicated by the confidentiality the parties had imposed on themselves and the Court. It would have been better if they had simply come in on March 31 and said on the record "We have an agreement; we have agreed on everything; the defendants have agreed on providing adequate security; and we are simply trying to specify what that means." I take responsibility for not having ordered them to

come in to explain their circumstances, particularly given the size, complexity and importance of the lawsuit.

Once it became clear that this dispute over a settlement agreement could not be rendered without an evidentiary hearing, I informed the lawyers that the previous confidentiality protection would be lifted and the dispute would be open to public scrutiny.

of the defendants' recalcitrance I am unable to specifically enforce the agreement, that will be grounds for a remedy for breach of the settlement agreement.

The Magistrate Judge's recommendation is ACCEPTED, the defendants' objection is OVERRULED, and the plaintiffs' motion is GRANTED for the reasons set forth in this Memorandum Decision.

It should be clear from this opinion that I have respect for how the lawyers have professionally handled this difficult situation (but for the telephone conference of March 28, 2000). I expect the same professional behavior from them in the weeks ahead in implementing the settlement agreement now that I have ordered it enforced.

So ORDERED.