**Emilio DeCARO, Plaintiff**

v.

**HASBRO, INC., Defendant.**

**C.A. No. 06–30107–MAP.**

United States District Court,
D. Massachusetts.

March 31, 2008.

Neil H. Jacobs, Shari G. Kleiner, Christina P. Marisam, WilmerHale LLP, Boston, MA, for Defendant.

Tani E. Sapirstein, Sapirstein & Sapirstein, P.C., Springfield, MA, for Plaintiff.

*MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT* (Dkt. No. 49)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff Emilio DeCaro ("DeCaro"), a long-time press operator who has been diagnosed with multiple sclerosis ("MS"), has sued Hasbro, Inc. ("Hasbro") for violating the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 4(16) ("151B, § 4(16)")[1] and for breach of contract. Hasbro has moved for summary judgment on both counts. The court will allow Defendant's motion on the breach of contract claim because Plaintiff has failed to establish a *prima facie* case, but will deny the motion as to the claims

under 151B, § 4(16) due to the existence of disputed issues of material fact.

## II. *STANDARD OF REVIEW*

Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if it "may reasonably be resolved in favor of either party at trial." *Cordi–Allen v. Conlon,* 494 F.3d 245, 249 (1st Cir.2007). The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 42 (1st Cir.1999).

## III. *BACKGROUND*[2]

Plaintiff began working for Defendant in 1985. In 1997 he was promoted to the position of First Pressman. He worked as a First Pressman on the third shift until he took a medical leave of absence in May of 2005 in order to obtain treatment for his MS. At all times, Plaintiff was employed pursuant to a collective bargaining agreement. Each year Plaintiff also received a pamphlet on health benefits. He did not receive an employee handbook or any other written policies or guidelines concerning the terms of his employment with Hasbro. Neither the collective bargaining agreement nor the health plan information addressed procedures for returning to work following a medical leave.

---

1. Plaintiff has stated three separate claims under 151B, § 4(16): (1) discrimination on the basis of actual handicap, (2) discrimination on the basis of perceived handicap, and (3) discrimination based on a record of handicap. As the parties do not dispute that DeCaro was handicapped as a result of his multiple sclerosis, that Hasbro perceived him to be so,

and that Hasbro was aware of Plaintiff's MS diagnosis, the court will treat these three separate claims together.

2. Unless another source is cited, the facts are drawn from Dkt. No. 53, Def.'s Statement of Undisputed Material Facts and Dkt. No. 58, Pl.'s Statement of Facts in Dispute.

## A. *The First Pressman Job.*

Plaintiff's position as a First Pressman required him to complete physical tasks as part of his job. Most of the time Plaintiff worked as the lead operator on a Harris six-color press. The Harris press was about forty feet long and had six separate printing units. DeCaro and his coworkers accessed the different units via an elevated catwalk less than three feet wide. At each unit several steps led down to an area approximately fifteen inches wide which contained a cylinder less than one foot above the floor. In preparation for a print run, they installed packings and printing plates on the cylinders. When running, the Harris press printed approximately 4,500 sheets of paper or 3,700 sheets of cardboard per hour.

The parties do not agree on a list of the essential tasks of the First Pressman position or the strenuousness of certain tasks. Each side has cited to evidence in the record to support its position.

Hasbro contends that the job required DeCaro to do certain tasks to get a print job ready and other tasks while a print job was running. According to Hasbro, print jobs would have to be readied between one and four times a shift. Readying a print job involved standing, walking, and crouching for between one and two hours. During the "make ready" process Hasbro asserts that a First Pressman like DeCaro would have (1) used both hands to carry large, metal printing plates and packings to the cylinders; (2) accessed the cylinders to mount the plates and packings; (3) cut and changed the blanket packings on cylinders; (4) prepared ink; (5) assisted with filling ink and water units; (6) accurately entered job data; (7) used two hands to pull several test sheets from the press in order to check the color and alignment; and (8) adjusted press mechanisms and corrected chemistry to ensure print jobs met specifications. Additionally, Hasbro states that during the course of a print run DeCaro would have had to stand every five to eight minutes to pull printed sheets from the press, with both hands, to re-check the color and alignment.

Plaintiff describes the essential tasks of the First Pressman differently. While he does not dispute that all the tasks Hasbro attributes to First Pressman had to be done, he argues that as a First Pressman Plaintiff could delegate many of the more physical tasks to other employees. DeCaro also suggests that some of the tasks were not as physically demanding as Hasbro suggests. Specifically, he notes that the large, metal printing plates weighed less than ten pounds and were put on the presses by two or three employees; ink cans weighed approximately five pounds and were carried to the press by another employee; two hands were not necessarily needed when carrying printing plates or pulling printed sheets out of the press; and he would have needed to pull printed sheets every seven to fifteen minutes rather than every five to eight minutes.

In addition to arguing that the First Pressman position was not as physically demanding as Hasbro has suggested, Plaintiff has presented testimony regarding certain accommodations which, he argues, would have enabled him to perform the essential tasks of the First Pressman position. Nancy L. Segreve, the Certified Rehabilitation Counselor retained by DeCaro, opined that Plaintiff could have used a sit/lean stool during the course of his shift to mitigate fatigue while still being able to return quickly to a standing position as the job required. (Dkt. No. 61, Ex. 8, Segreve Evaluation 250–51.) Segreve also suggested that DeCaro could take "micro-task breaks" during his shift to manage his fatigue. Additionally, during his final attempt to return to work DeCaro also suggested that he could use a cane

during some parts of his shift to help him meet the physical challenges of the First Pressman position.

## B. *Plaintiff's Employment from 2000 to 2005.*

In 2000 Plaintiff was diagnosed with multiple sclerosis, a chronic disease that attacks the central nervous system. Despite his condition he continued to work as a First Pressman until he voluntarily went on medical leave in May 2005. Beginning in 2001, before he obtained a handicapped parking placard, Defendant permitted him to park in a handicapped spot at the plant.

On February 23, 2005, a few months before he went on leave, Plaintiff received a written disciplinary warning following a flawed printing job he ran on February 18, 2005. DeCaro asserts that during the print run he had brought the problem that was producing the flaw to his supervisor's attention and was told to continue running the job nevertheless. He also asserted that other employees who had been responsible for more costly errors did not receive written disciplinary warnings.

On the same day DeCaro received the written warning, his direct supervisor, Bill Hoarle, informed the printing manager of reports from two other employees that Plaintiff had stumbled on two occasions. Plaintiff was temporarily relieved of his duties, and the following day Defendant's medical department requested documentation from Plaintiff's treating medical provider stating that he could work safely.

By letter dated March 7, 2005, Dr. Mohammad Ali Hazratji, the neurologist treating Plaintiff's MS, informed Defendant that Plaintiff could work safely around machines, but requested that Plaintiff be given a ride to his work area from the plant entrance. After Defendant received this letter, Plaintiff was allowed to return to press work and use a golf cart to travel to his work area. Plaintiff began receiving chemotherapy treatments from Dr. Robert Byrne for his MS in April 2005 and was granted voluntary medical leave in May 2005.

## C. *Effects of Chemotherapy on Plaintiff.*

On April 6, 2005, Plaintiff received his first chemotherapy treatment. He received additional treatments on May 4, 2005, June 1, 2005, September 15, 2005, December 14, 2005, April 25, 2006, May 24, 2006, June 20, 2006, and in September 2006. During May 2005, Plaintiff began his approved medical leave and successfully applied for short-term disability coverage. He received short-term disability payments from May 11, 2005 to November 8, 2005, the maximum 182 days allowed by Defendant.

While on medical leave, Plaintiff applied for Social Security Disability Benefits ("SSDI benefits") in July 2005. The Social Security Administration ("SSA") approved Plaintiff to receive benefits on November 17, 2005, and Plaintiff continued to receive SSDI benefits thereafter.

DeCaro provided specific details about his then-current physical condition as part of his SSDI application. On the SSA Function Report and SSA Questionnaire on Fatigue in September 2005, Plaintiff wrote that due to his "illness, injuries, or conditions" he could no longer work, play sports, garden, or take his children to the mall or to movies (Dkt. No. 54, Ex. 24, SSA Function Report 313); his MS affected his ability to lift, squat, bend, stand, walk, climb stairs, see, complete tasks, concentrate, and use his hands (*Id.* at 317); he had developed a fear of falling down (*Id.* at 318); he used mobility aids including a cane and wheelchair when there was "a lot of walking involved" (*Id.*); his MS caused fatigue which began to affect him in January, 2005 (Dkt. No. 54, Ex. 25, SSA Questionnaire on Fatigue 321); his fatigue

was constant, occurring whenever he started doing anything and sometimes lasted all day (*Id.* at 320); and his fatigue limited his activities and made walking "tough" (*Id.* at 321). He also stated that he had been receiving chemotherapy, which had "really knock[ed][him] out." (Dkt. No. 59, Ex. 24, at 319.)

### D. Plaintiff's Physical Condition During His Medical Leave.

The record relating to Plaintiff's physical condition during the time he received chemotherapy is relatively sparse. In August, October, and December 2005 and in March, April, and June of 2006 DeCaro saw Hazratji, his neurologist. On their face, the records from his visits during this period provide limited insight into his physical condition at various times.[3] (Dkt. No. 54, Ex. 22.) The narrative portions of the records seem to indicate a decline in his condition coupled with some falls in 2005. (*Id.* at 302–04.) However, beginning at the end of 2005, Hazratji was recommending that DeCaro increase his exercise, suggesting that DeCaro's fatigue was abating. (*Id.* at 304.) By June 2006, Hazratji noted that DeCaro was "overall better" and had "started working out." (*Id.* at 307.)

In late October 2005, Dr. Byrne submitted a Treating Physician Report to the SSA on behalf of DeCaro. His report indicated that Plaintiff had "significant difficulty in working, walking, lifting, [and] carrying heavy objects." (Dkt. No. 54, Ex. 26, Treating Physician Report 322.) On November 1, 2005 Dr. Shankar Narayan completed an SSA Physical Residual Functional Capacity Assessment for Plaintiff's SSA application. (Dkt. No. 54, Ex. 27, Physical Residual Functional Capacity Assessment.) His conclusions, which were based on information in Plaintiff's SSA application, included that Plaintiff had poor balance, was falling frequently, and requiring a cane to ambulate. (*Id.* at 326.) Additionally, Narayan reported that DeCaro should avoid "concentrated exposure" to machinery and heights. (*Id.* at 328.) Again, Plaintiff argues that a jury could discount these opinions, because Narayan did not examine Plaintiff.

DeCaro first attempted to return to work on November 29, 2005, about two weeks after he was granted SSDI benefits. The record, beyond the notes made by Hazratji, does not contain any specific, contemporaneous evidence about DeCaro's physical condition, and any changes thereto, which occurred between November 1, 2005 when Narayan filed his report to supplement DeCaro's SSA application and June 2006, when Plaintiff last attempted to return to work. On the other hand, DeCaro twice received notes from Dr. Byrne (who was in charge of his chemotherapy) specifically stating that he could go back to work.[4] Plaintiff's position now is that he was physically able to return to work when he attempted to do so on November 29, 2005, February 2, 2006, March 15, 2006, and June 6, 2006.

---

3. At his deposition in 2007 Hazratji opined that Plaintiff would not have been capable of returning to work during the relevant period from November 2005 to June 2006, when Plaintiff contends that Defendant discriminated against him based on his disability. Plaintiff argues the opinions offered by Hazratji might reasonably be rejected by a jury, because of a dispute between Plaintiff and Hazratji related to this case.

4. Byrne later informed Hasbro by letter, and reaffirmed during his deposition, that he did not seek information about DeCaro's job or conduct an examination to determine Plaintiff's specific physical abilities prior to issuing the notes. On the other hand, he did opine that side effects from the chemotherapy he administered would not have prevented DeCaro from working except during the first few days following administration.

E. *Doctor's Notes and Plaintiff's Attempts to Return to Work.*

Hasbro had a written policy related to employees returning from medical leaves. Pursuant to the policy, an employee was required to provide notes from a treating physician to remain out on medical leave and would be allowed to return to work if he presented a letter from the same physician clearing him to work. DeCaro, like most other Hasbro employees, never received this policy in writing. He was, however, generally aware of the policy and believed that he would need a letter from Byrne both to keep him out on leave and to allow him to return to work.

Byrne's office issued a series of out-of-work notes beginning on May 11, 2005. (Dkt. No. 54, Ex. 20.) These notes, which specified a period between two dates when Plaintiff was excused from work and listed a date when Plaintiff could return to work, covered the entire period between May 11, 2005 and May 12, 2006.(*Id.*) Byrne also issued two return-to-work notes, which included a date on which Plaintiff could return to work. (*Id.* at 290–91, 296.)

In September 2005, Byrne's office faxed Hasbro a note keeping DeCaro out of work until December 15, 2005. (*Id.* at 289.) Then, on November 22, 2005, Byrne signed a return-to-work note that stated that Plaintiff could return to work on November 29, 2005. The note also requested that DeCaro be permitted to work the second shift. (*Id.* at 290–91.) There are two copies of that note, one later annotated to state that DeCaro "is able to return to his regular work." (*Id.* at 291.)

Pursuant to that note, Plaintiff reported to work his regular shift on November 29, 2005. Upon arriving at work DeCaro was driven to Hasbro's medical department to be cleared to return to work. Carol Hawk, the nurse on duty, refused to allow him to return to work based on her belief that he was unsteady on his feet. The record is unclear as to whether she told him that he would need to provide a return-to-work letter from Dr. Hazratji, the physician treating him for MS, rather than Dr. Byrne, the physician administering the chemotherapy.[5] The next day Byrne's office faxed another out-of-work note to Hasbro stating that Plaintiff could return to work in February 2006. (*Id.* at 292.)

DeCaro attempted to return to work again on February 2, 2006. As in November, he was taken to the medical department, where Hawk observed DeCaro holding onto chairs as he walked across the waiting room. Based on this observation and her general perception of DeCaro, Hawk again refused to allow him to return to work. Hawk also may have told DeCaro that he would need a note from his primary care physician or neurologist before she would allow him to return to work.

The day after Plaintiff tried to return to work on February 2, 2006 he spoke with Hawk by telephone. During that conversation Hawk suggested he go on long-term disability. He responded that he wished to do that only as a last resort. During that conversation Hawk did not tell Plaintiff that he needed a return-to-work note from his neurologist or primary care physician.

---

5.  The 56.1 statement and response filed by the parties are not clear on this point. The contemporaneous note made in the medical charting maintained by Hasbro indicates that Hawk informed DeCaro that he would need to provide a note from Hazratji. (Dkt. No. 54, Ex. 11, at 255.) DeCaro appears to have conceded this in his deposition, but his answers during that portion of the deposition are somewhat confused, and he later asserted that Hawk told him to get a note from his doctor, but that she never said it needed to be from his neurologist. (Dkt. No. 60, Ex. 7, DeCaro Dep. 138–42.)

Byrne's office subsequently issued additional notes which, taken together, allowed DeCaro to remain out from February 1, 2006 until May 15, 2006. On May 15, 2006, DeCaro tried to return to his regular shift. Prior to this attempt to return to work, DeCaro saw his neurologist, Dr. Hazratji, twice but he did not get a return-to-work note from any doctor other than Byrne. Because Hawk had previously told him he could not work because he was too unstable on his feet, DeCaro may have used a cane when he attempted to return to work for the third time. One reason he sometimes used a cane was to reassure people who mistook his limp to be a sign of instability. Hawk again believed Plaintiff was unsteady. Based on this perception, Hawk refused to allow DeCaro to return to work. Whether she informed DeCaro that he would need a return-to-work note from his neurologist is disputed.

On May 31, 2006, Byrne's office faxed a return-to-work note stating that Plaintiff could return to work on June 6, 2006. DeCaro did not obtain medical clearance from any other doctor before he attempted to return to work for a fourth and final time on June, 6, 2006. On that day he used his cane, and Hawk again refused to allow him to return to work based on her concerns about his safety. She also expressed doubt about whether he would be permitted to use his cane at his work station.

F. *Developments Following Plaintiff's Last Attempt to Return to Work.*

On June 12, 2006, Elaine Eldridge, Hasbro's Medical Department Manager, sent a letter requesting that Byrne make a specific determination regarding Plaintiff's ability to perform the tasks on a list of the essential functions of the First Pressman position. Plaintiff disputes Hasbro's contention that all items on the list are, in fact, essential functions of the First Pressman position. Additionally, he points out that the letter made no mention of the possibility of reasonable accommodations. DeCaro received a copy of the letter shortly after June 12, 2006, along with a letter explaining that Hasbro would not allow him to return to work until it received certification that he could perform his job with or without reasonable accommodation. He filed this lawsuit on July 3, 2006.

## IV. *DISCUSSION*

### A. *Violation of Mass. Gen. Laws ch. 151B, § 4(16).*

■ DeCaro claims that Hasbro violated 151B, § 4(16), by discriminating against him on the basis of his actual handicap, perceived handicap, or record of handicap by (1) refusing to allow him to return to work on four occasions between November 2005 and May 2006, (2) refusing to provide him with reasonable accommodations related to his MS, and (3) discriminating against him in the terms and conditions of employment. To establish a claim under 151B, § 4(16), DeCaro must prove:

(1) [he] is handicapped within the meaning of the statute; (2)[he] is a 'qualified handicapped person' (meaning that, notwithstanding the handicap, [he] can perform the essential functions of the job, either [a] without accommodation, or [b] with a reasonable accommodation provided by the employer, subject to the statutory qualification that the accommodation not pose an undue hardship upon the employer); and (3) the handicap was the cause of the allegedly unlawful discriminatory action.

*Cargill v. Harvard Univ.,* 60 Mass.App.Ct. 585, 804 N.E.2d 377, 379 (2004).

At least for the purposes of this motion, Defendant accepts that due to his MS DeCaro was a handicapped individual within the meaning of the statute at the times that Plaintiff asserts he suffered illegal

discrimination. Though it concedes that DeCaro is a handicapped individual, Hasbro argues that it is entitled to summary judgment because, on the record before the court, Plaintiff cannot establish (1) that he was a "qualified handicapped person" when he tried to return to work or (2) that Hasbro took unlawful, discriminatory action against him because of his MS.

### 1. *Was DeCaro a Qualified Handicapped Person?*

Hasbro argues that no reasonable jury could conclude that DeCaro was a "qualified handicapped person" on any or all of the occasions when he attempted to return to work. Specifically, Defendant contends that DeCaro has failed to present sufficient evidence to support his claim that he was physically able to perform the essential functions of the First Pressman position, with or without accommodation, on any of the occasions when he attempted to return to work. If Defendant's contention were correct, it would of course be entitled to summary judgment. *August v. Offices Unlimited, Inc.,* 981 F.2d 576 (1st Cir. 1992) (affirming the district court's grant of summary judgment in favor of an employer sued under 151B, § 4(16), where the plaintiff failed to explain how his previous sworn assertions of total and continuous disability were compatible with his claim that he possessed the ability to do his job with reasonable accommodation).

Any determination of DeCaro's ability to perform his job involves an assessment of the job's requirements and his physical condition. The parties offer conflicting accounts of the essential functions of the First Pressman position held by DeCaro and the potential impact of reasonable accommodations. These specific disputes cannot be resolved on a motion for summary judgment. Therefore the court must accept the less strenuous description offered by Plaintiff and described in detail above.

Even as Plaintiff describes it, the First Pressman's job clearly has a physical component which must inform the court's evaluation of the DeCaro's ability to handle the job. The court must determine whether the person was "capable of performing the essential functions of a particular job, or [ ] would [have been] capable ... with reasonable accommodation to his handicap." Mass. Gen. Laws ch. 151B, § 1(16).

Whether reasonable accommodations would have enabled a disabled person to perform the essential functions of his job is a separate question from whether an employer impermissibly failed to provide reasonable accommodation. At this stage of the inquiry the court is not concerned with what accommodations were requested or provided, but simply whether any reasonable accommodations would have permitted DeCaro to perform the essential functions of the First Pressman position.

The parties do not appear to dispute the reasonableness of the accommodations Plaintiff now asserts would have enabled him to return to work, such as the provision of a stand/lean stool, micro-task breaks, or some use of a cane. Instead, Hasbro asserts that even with these accommodations DeCaro was not physically able to perform the essential functions of any job with a physical component during the time that he received chemotherapy.

In making its argument, Hasbro points primarily to three areas of the record: (i) the absence of supporting testimony from Plaintiff's treating physicians, (ii) Plaintiff's deposition testimony stating that he would not have been able to return to work until three months after his last chemotherapy treatment, and (iii) Plaintiff's sworn description of his physical condition at the time he filed for SSDI benefits. The court will address each of these arguments below.

### a. *Testimony of Treating Physicians.*

Hasbro asserts that the testimony of DeCaro's treating physicians establishes that he was unable to perform the essential functions of the First Pressman position during the relevant period. Defendant relies first on the reports Dr. Byrne and Dr. Narayan made to the SSA on October 27, 2005 and November 1, 2005 respectively, prior to Plaintiff's first attempt to return to work on November 29.

The conclusions to be drawn from Dr. Byrne's report are doubtful, since less than one month later he issued a return-to-work note for Plaintiff, expressing the opinion that Plaintiff was capable of returning to work. Later notes took the same position.

Even unaccompanied by a formal assessment of Plaintiff's physical condition and the specific requirements of his job, a reasonable jury could credit the contemporaneous opinions contained in the later notes. Paired with DeCaro's own testimony that he was capable of working at the relevant times, a jury could conclude that his fatigue became less debilitating after he filed his application for SSDI.

Hasbro also makes much of Dr. Hazratji's treatment notes, but their substance is not as conclusive as Hasbro suggests. The notes describe symptoms DeCaro experienced but do not quantify their impact on his ability to engage in certain activities. Additionally, it is not clear from the notes whether certain symptoms were improving or worsening over time. Ultimately, there is information in the notes that could lead a reasonable jury to draw a variety of conclusions about DeCaro's condition at the time of each appointment.

In addition to his notes, Hazratji offered opinions about DeCaro's physical capability during his deposition. The weight afforded to these opinions must be determined by the jury, especially in light of Plaintiff's allegation that Hazratji's opinion was affected by a disagreement he had with DeCaro during this case. Taken together, the medical records, notes, and testimony of the doctors might be construed to favor Hasbro, but might not. The task of sorting this out must be left to a jury.

### b. *DeCaro's Own Deposition Testimony.*

Hasbro asserts that DeCaro's own testimony during his deposition precludes him from now arguing that he was a qualified handicapped individual anytime between May 2005 and June 2006, the period during which he received regular chemotherapy treatments. During one exchange DeCaro was asked about how long following each chemotherapy treatment he "felt the kind of weakness that would keep [him] from going back to work." (Dkt. No. 60, Ex. 7, DeCaro Dep. 272.) He affirmed that the weakness he felt after chemotherapy made him unable to go to work during the period between chemotherapy treatments. (*Id.* at 272–73.)

Elsewhere in the same deposition, however, Plaintiff stated that he would have been able to perform the duties of a First Pressman without restriction when he tried to return to work in November 2005. (*Id.* at 120–21, 348). DeCaro has also recently filed an affidavit in which he asserts that he "felt physically capable of returning to [his] job as a First Pressman" each time he attempted to return to work. (Dkt. No. 67, Ex. F, DeCaro Aff.)

Generally, when deposition testimony is contradicted in a later affidavit, especially where the affidavit is executed after a motion for summary judgment is filed, the court should not give the affidavit much weight. *Cf. Orta–Castro v. Merck, Sharp, & Dohme Quimica P.R., Inc.,* 447 F.3d 105, 110–11 (1st Cir.2006) (rejecting plaintiff's contention that a sworn statement,

which conflicted with plaintiff's deposition testimony, made after the defendant filed its motion for summary judgment was sufficient to create an issue of material fact). In this case, however, DeCaro made a more limited, though equally contradictory statement twice at his deposition when he stated that he was physically capable of working when he sought to return to work in November 2005. (Dkt. No. 60, Ex. 7, DeCaro Dep. 120–21, 348.)

It is possible, depending on the testimony at trial, that a reasonable jury could conclude that the apparent contradiction was a result of DeCaro misunderstanding the questioning about his weakness following chemotherapy or not considering how reasonable accommodations, such as use of a sit/lean stool, could have enabled him to do his job in a modified fashion. For these reasons, Plaintiff's own deposition testimony is insufficient to entitle Defendant to summary judgment on the grounds that he was not a qualified handicapped person.

### c. *DeCaro's Pre–Litigation Sworn Descriptions of His Physical Condition.*

Finally, Hasbro argues that DeCaro's representations on his successful application for SSDI, which is available only when the SSA determines an applicant is "totally disabled," prevent him from establishing that he was physically able to carry out the essential functions of his job. The Supreme Court, however, has held that the pursuit and receipt of SSDI benefits does not bar a federal disability claim. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). Similarly, the Massachusetts Supreme Judicial has held that "a plaintiff's prior pursuit, and receipt, of benefits based on an assertion of 'total disability' does not automatically estop [him] from pursuing a claim of employment discrimination on the basis of disability under G.L. c. 151B, § 4(16), so long as a disputed

issue of fact remains whether the plaintiff is able to perform the 'essential functions of the position involved.'" *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 772 N.E.2d 1054, 1062 (2002) (adopting the reasoning in *Cleveland* ). A plaintiff who has received SSDI may pursue a claim under 151B, § 4(16) if he can explain how the claims are consistent or raise a question of fact about his ability to do his job, including with reasonable accommodation. *Russell*, 437 Mass. at 452–53, 772 N.E.2d at 1062.

DeCaro has presented sufficient evidence from which a reasonable jury could conclude that he was able to return to work, despite his receipt of SSDI. He concedes that he experienced an increased level of fatigue while undergoing chemotherapy. However, a reasonable jury could conclude that with reasonable accommodation, such as provision of a sit/lean stool, he would have been able to perform the essential functions of his job.

In sum, Plaintiff has made a sufficient showing that he was able to carry out the essential functions of the First Pressman position at the times he attempted to return to work. Though the evidence presented by Hasbro has weight, DeCaro's physical condition at the relevant times cannot be determined without assessing the credibility of the witnesses and weighing the evidence. Because a jury must determine such facts, Defendant is not entitled to summary judgment on the grounds that Plaintiff was not a qualified handicapped person.

### 2. *Allegedly Discriminatory Actions.*

Defendant also argues that it is entitled to summary judgment because Plaintiff has not presented sufficient evidence that it took adverse employment action against him on account of his disability. In his complaint DeCaro has alleged that Has-

bro's discriminatory actions included (i) not allowing him to return from medical leave, (ii) not providing him with reasonable accommodations, and (iii) discriminating against him in the terms and conditions of employment. Defendant is not entitled to summary judgment on this issue if a reasonable jury could conclude based on the facts in the record, construed in the light most favorable to Plaintiff, that Hasbro took any one of these three actions.

■ Hasbro asserts that the decisions that kept DeCaro out of work were made consistently with its policy requiring certification from a doctor whenever an employee returned from medical leave. Defendant correctly notes that an employer may require a medical certification from a returning employee who the employer knows has been on leave due to an inability to perform his job functions, so long as the requirement is "functionally related to the specific job . . . and [is] consistent with the safe and lawful performance of the job." Mass. Gen. Laws ch. 151B, § 4(16); see also Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667 (1st Cir.1995); White v. City of Boston, 7 Mass.L.Rptr. 232, 1997 WL 416586 (Mass.Super.Ct.1997) (finding employer did not violate 151B, § 4(16) when it required an employee who had been on disability leave to submit to physical and mental examinations before returning to work).

Indeed, the medical certification may help employers better accommodate the needs of their employees. See Grenier, 70 F.3d at 677. DeCaro, recognizing that a medical certificate may be required, responded that he in fact provided return-to-work notes from Dr. Byrne, the same doctor who authorized Plaintiff's medical leave, certifying his fitness to work.

Hasbro's riposte is that it informed DeCaro as early as November that he would need to provide a medical certification from his neurologist or primary care physician. The record is disputed as to when this requirement was communicated to DeCaro. Additionally, though Hasbro had sought a medical certification directly from Dr. Hazratji in February 2005, it did not seek such a certification during the period when Plaintiff was trying to return to work. Nor did Hasbro request further information or clarification from Dr. Byrne until after DeCaro's fourth attempt to return to work.

■ These disputed facts are sufficient to raise a question as to whether, with respect to Plaintiff, Hasbro applied its policies related to employees returning from medical leave in a discriminatory manner. Plaintiff's claim is not undermined by Hasbro's assertion that it applied its policies to other employees who have successfully made the transition back to work from medical leave, because it is the specific application of the policy to DeCaro, rather than the substance of the policy, which is allegedly discriminatory. The questions of whether Defendant properly refused to allow Plaintiff to return to work, offered him a reasonable accommodation, or discriminated against him based on his disability remain for the jury.

B. *Breach of Contract Claim.*

■ Hasbro has also moved for summary judgment on Plaintiff's claim that it "breached its contract with [DeCaro] by failing to adhere to the provisions of the Employee Handbook and/or personnel policies and guidelines" when it requested a return-to-work note from a doctor other than the one who issued the out-of-work notes. (Dkt. No. 1, Compl. ¶ 46.) A plaintiff who has alleged breach of contract must show (1) that the parties made an agreement supported by valid consideration, (2) the plaintiff was willing and able to perform, (3) the defendant breached the

agreement, and (4) the defendant's breach damaged the plaintiff. *Singarella v. Boston*, 342 Mass. 385, 173 N.E.2d 290, 291 (1961).

The parties agree that DeCaro was employed pursuant to a collective bargaining agreement which was silent as to the process of returning from medical leave.[6] They also agree that other than an annual pamphlet about his medical benefits he "received no policies, guidelines, or handbook that applied to him as an employee." (Dkt. No. 53, Def.'s Statement of Undisputed Facts ¶3; Dkt. No. 58, Pl.'s Statement of Facts in Dispute. ¶3.) In the absence of a written contract, DeCaro alleges that there was an oral contract which bound Hasbro to return him to work once he produced a note from his treating physician releasing him to work without restrictions.

■■■■ "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement." *Salem Laundry Co. v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 829 F.2d 278, 280 (1st Cir.1987) (*citing* 1 Williston on Contracts § 18, at 32 (3d ed. 1954)). A finding of mutual assent must be based on the words and actions of each party. *See Salem Laundry*, 829 F.2d at 280. Plaintiff has not pointed to any specific facts regarding the creation of the alleged oral contract, such as what was said when and by whom. Therefore there is no factual basis to support a finding of mutual assent.

■■■■ The mere existence of internal, written policies does not support a finding of mutual assent. Indeed the fact that the written policies were not distributed to employees suggests that Hasbro did not intend to bind itself to apply those policies consistently in all situations. *Cf. Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 525 N.E.2d 411, 415–16 (1988) (finding that an employer did not intend to be bound by terms set out in a written employee manual in part because the employer retained the right to modify the terms). As Plaintiff is unable to show there was a binding agreement, his breach of contract claim necessarily fails.

## V. *CONCLUSION*

For the reasons discussed above, Defendant's Motion for Summary Judgment (Dkt. No. 49) is hereby ALLOWED as to Plaintiff's breach of contract claim and DENIED as to Plaintiff's 151B, § 4(16) claims. The clerk is ordered to set the case down for a status conference to discuss further proceedings.

It is So Ordered.

---

6. Plaintiff has brought only state-law claims in this case, abjuring reliance on the collective bargaining agreement for his breach of contract claim. Federal law would preempt his state-law claim if the meaning of the collective bargaining agreement would have to be determined before the state-law claim could be resolved. Labor Management Relations Act, 29 U.S.C. § 185; *Flibotte v. Penn. Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997).